IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| TERRY ANDERSON, individually, | ) | |
| | ) | Case No. CV 02-588-S-BLW |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM ORDER** |
| v. | ) | |
| | ) | |
| WARDEN JOE KLAUSER-ISCI | ) | |
| DEBRA CLYDE, BRUCE COOPER, | ) | |
| MR. AMAN, MONICA FORD, and | ) | |
| MARY SNARR, individually and in | ) | |
| his or her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Pending before the Court are the following motions ripe for adjudication: Motion for Summary Judgment filed by Defendant Monica Ford (Docket No. 111); Motion for Summary Judgment filed by Defendants Clyde, Cooper, and Snarr (Docket No. 117); Plaintiff's Motion to Strike Affidavit (Docket No. 130); and Defendants' Motion for Extension of Time (Docket No. 134). After reviewing the record in this case, the Court finds that the decisional process would not be furthered by oral argument and will therefore resolve the pending motions based upon the parties' briefing. Accordingly, the Court enters the following Order.

I.

BACKGROUND

At the time of the incidents at issue, Plaintiff Terry Anderson was an inmate housed at the Idaho State Correctional Institution (ISCI). He alleges that during the month of October 2000, Defendants were deliberately indifferent to his back condition. He eventually had to undergo emergency surgery. He also alleges that Defendants were deliberately indifferent in providing post-surgery care.

II.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendant Ford first asserts that Plaintiff failed to exhaust his administrative remedies, and that his Complaint is subject to dismissal. 42 U.S.C. § 1997e(a) requires a prisoner to exhaust all administrative remedies prior to filing a civil rights complaint. *See Wyatt v. Terhune*, 315 F.3d 1108 (9th Cir. 2003). Because failure to exhaust is an affirmative defense, *Wyatt*, 315 F.3d at 1119, Defendants bear the burden of proving nonexhaustion.

Plaintiff asserts that Defendants were deliberately indifferent to his back condition, both before and after his October 2000 surgery. On December 12, 2000, Plaintiff filed a Grievance complaining that he had received inadequate care for his back. Mary Snarr responded. The Grievance response was reviewed by Monica Ford, an administrative assistant, who obtained information about Plaintiff's case from the medical department. *See Complaint*, at p. 17 (Copy of Grievance) (Docket No. 3). Defendants state that Ford responded on behalf of Warden Paskett. *Ford's Memorandum in Support of Motion for*

*Summary Judgment*, at p. 2 (Docket No. 111, Attachment 2).  Defendants also argue that Plaintiff did not appeal Monica Ford's response to Warden Paskett.

In this instance, the Court concludes that it would be unclear to a prisoner who received a response to a grievance from an individual speaking *on behalf of the warden* that he would then have to appeal to the warden, who, in effect, just answered the grievance through his agent.  Because the warden had already considered the issue through his agent Monica Ford, the Court concludes that Plaintiff sufficiently exhausted the administrative review process.  *See Brown v. Valoff*, – F.3d –, 2005 WL 2129069 (9th Cir. Sept 6, 2005) (prisoner may stop at intermediate level of grievance system if prison makes it clear that no further relief is available).

Defendants also argue that Plaintiff did not include all of his particular complaints about the lack of proper care for his back in his grievance, including the failure to provide physical therapy.  However, the Court reads the grievance to include any and all allegedly improper care regarding his back condition: "I am very upset because of the outcome of my surgery."  *See Exhibit A, Grievance attached to Affidavit of Gloria Counsil*, at p. 5 (Docket No. 111, Attachment 5).

For all of the foregoing reasons, the Court considers the claims in the Amended Complaint administratively exhausted. Therefore, the Court will not dismiss the Complaint under 42 U.S.C. § 1997e(a).

### III.

### MOTIONS FOR SUMMARY JUDGMENT
### ON MERITS OF PLAINTIFF'S CLAIMS

**A.      Standard of Law**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In a motion for summary judgment, the moving party bears the "initial burden of identifying for the court those portions of the record which demonstrate the absence of any genuine issues of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)). If the moving party points to portions of the record demonstrating that there appears to be no genuine issue of material fact as to claims or defenses at issue, the burden of production shifts to the non-moving party. To meet its burden of production, the non-moving party "may not rest upon the mere allegations contained in his complaint, but he must set forth, by affidavits, exhibits or otherwise, specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; *see T.W. Electric Serv.*, 809 F.2d at 630 (internal citation omitted).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences that can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted).

MEMORANDUM ORDER- 4

Rule 56(c) requires the Court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  The existence of a scintilla of evidence in support of the non-moving party's position is insufficient.  Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252. To prevail on an Eighth Amendment claim regarding prison medical care, Plaintiff must show that prison officials' "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)).

The Supreme Court has opined that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.*

> The Ninth Circuit has defined a "serious medical need" in the following ways: failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain; . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

Deliberate indifference exists when an official knows of and disregards a serious medical condition or when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws such an inference.

MEMORANDUM ORDER- 5

*Farmer v. Brennan,* 511 U.S. 825, 838 (1994). Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Mere indifference, medical malpractice, or negligence also will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th Cir. 1980). A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990).

**B.     Discussion**

The Court will now review Plaintiff's allegations of deliberate indifference as to each Defendant.

    1.     <u>Defendant Bruce Cooper</u>

        a.     *Initial Assessment*

Plaintiff's pain began the night of October 1, 2000, when he attempted to get onto his top bunk and his back "locked up" and became so painful he could not move. *Plaintiff's Deposition*, at p. 21-23 (Docket No. 122). Plaintiff's cellmate rang the emergency buzzer for help at about 4:00 a.m. He was told to wait until sick call. *Id.*, at p. 22-23.

On October 2, 2000, at approximately 8:35 a.m., Defendant Correctional Medical Specialist (CMS) Bruce Cooper responded to Plaintiff's complaints. Cooper's version of event is as follows: Cooper visited Plaintiff in his cell in response to Plaintiff's complaints of back pain. *See Amended Complaint*, at ¶¶ 9 & 13 (Docket No. 31);

MEMORANDUM ORDER- 6

*Affidavit of Bruce Cooper*, at ¶ 4 (Docket No. 9).   Plaintiff told Cooper that he "got up in his bunk and felt something move in his back," and that the pain was getting worse. *Cooper Affidavit*, at ¶ 5.

Cooper asserts that he examined Plaintiff in the following manner.  Cooper prodded the bottom of Plaintiff's feet.  He assessed Plaintiff's pulse, respiratory rate, and temperature, which were normal.  He assessed Plaintiff's mid-line range of movement, which was decreased due to pain.  *Id.*, at ¶¶ 6-7.  Cooper contacted Physician Assistant Russ Amaru, who prescribed the following for Plaintiff:  Naproxyn, an anti-inflammatory; and Robaxin, a muscle relaxant.  Cooper also provided for an order that allowed Plaintiff a 72-hour bunk lay-in and ice.  *Id.*, at ¶ 8.

Plaintiff's version of events is quite different.  He alleges:

> I had my cellie fill out a sick call thing and he went and got the sick call thing guy.  That was Bruce Cooper.  Mr. Bruce Cooper come in, and I told – he come in with three cops, three CO's and when I got – I was laying there on the bunk, just ripping pain, and by then my feet was already – my calves and my tops of my feet and in between my big toe and the next toe was already numb on both sides.
> I told him that and he jumps up there on the bottom and stabs – and pulls a pen out of his shirt, stabbed me in the foot, and "Can you feel that" and I says, "Yeah."  And he grabs my other foot and stabs me in the bottom of the foot.  "Can you feel that?"  I said, "Yeah."
> He jumped down.  "He lied to me.  He said his feet are numb" and turned around and left me laying there stuck on the bunk and walked out.  And that's the last I seen him.  And he told the cops I was lying and left me stuck up there on the bunk.
> I had to urinate.  I told him that when he was coming and when they was standing there.  I told him I had to use the bathroom and I needed help down.  I'm stuck up here and they turned around and left me stuck up there.
> So I had to get my cellie to pour out my coffee jar into my bowl and have – and urinate into the coffee jar.  Then when he did that I told him go get all my friends, go gt some of my friends and help me get down from

>here so if I have to use the bathroom again I can crawl, at least crawl to the toilet.
>
>And so that's what they did. And so they all helped me down.

*Plaintiff's Deposition*, at pp. 23-24 (Docket No. 122) (as transcribed).

Plaintiff also describes how he told Cooper that his calves and the tops of his feet were numb, but that Cooper ignored him, poked only the bottoms of his feet, and concluded that Plaintiff was lying. *Id*. at 27-28. Plaintiff admits that Cooper prescribed medication for him. *Id*. at p. 29.

Based upon the foregoing disputed facts, the Court concludes that there is a jury question as to whether Cooper was deliberately indifferent to the severity of Plaintiff's back condition. Therefore, Cooper is not entitled to summary judgment on this issue.

### b. Post-Surgery Denial of Flagyl Medication

Plaintiff also asserts that Cooper denied him Flagyl, an antibiotic medication, after his surgery. Cooper should have administered the drug to Plaintiff at 8:00 a.m. on November 24, 2000, but did not administer it until 11:00 a.m. because he needed another medical staff member to help him. Physician Assistant Amaru helped Cooper administer the dose at 11:00 a.m., and then Amaru changed the remaining dosage times so that the medication schedule could be returned to normal by 8:00 a.m. the next day. Plaintiff has stated no particular pain or injury arising from the three-hour delay in receiving the medication. A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990). Accordingly, Cooper is entitled to summary judgment on this issue.

### c. Failure to Change Post-Op Wound Dressing

Plaintiff also asserts that Cooper failed to change his post-op dressing on November 24, 2000. *Deposition Transcript*, at pp. 33-35. Again, Plaintiff points to no particular injury that occurred as a result of the failure to change the dressing.[1] Accordingly, Cooper is entitled to summary judgment on this issue.

2.   Defendant Clyde

Dr. Debra Clyde examined Plaintiff on the afternoon of October 2, 2000, after Bruce Cooper's assessment. She states that Plaintiff told her that he had suffered a previous back injury in 1995, and that the present problem began when he experienced a sharp pain after he had jumped up on his bunkbed. She determined that he had acute low back pain, consistent with his past history and the triggering event he described. Dr. Clyde gave Plaintiff pain medication and admitted him into the infirmary. Dr. Clyde ordered x-rays of Plaintiff's back on October 6, 2000. She believed the x-ray results were consistent with her diagnosis. Plaintiff reported that he was "moving much better" on October 9, 2000. Plaintiff was released from the infirmary on October 10, 2000. Plaintiff's condition continued, but Dr. Clyde believed that the condition was slowly improving. Dr. Clyde sent Plaintiff to the hospital for an MRI on October 26, 2000, and that is when his back infection was discovered and his surgery performed. *See Clyde Affidavit* (Docket No. 117, Attachment 5).

While Dr. Clyde asserts that her periodic treatment of Plaintiff was adequate and appropriate, and amounted, at most, to a misdiagnosis, Plaintiff's alleged facts create a

---

[1] The Court notes that, much earlier in time, Plaintiff's wound became infected after he returned to the prison after surgery; as a result, he was readmitted to the hospital on October 31, 2000. These allegations of November 24, 2000, have nothing to do with that episode.

MEMORANDUM ORDER- 9

genuine issue of material fact as to whether Dr. Clyde ignored the severity of Plaintiff's medical condition, asserting that he was "faking" it.

Plaintiff asserts that he told Dr. Clyde his injury was not "back strain," and that it was not due to lifting weights or getting up on his bed, as she had diagnosed. He asserts that Dr. Clyde would not listen. *Plaintiff's Deposition*, at pp. 36-37. He asserts that he asked to see a back specialist, but Dr. Clyde said, "absolutely not." *Plaintiff's Grievance*, at p. 1 (Docket 117, Attachment, Exhibit C, p. 5).

Plaintiff also alleges that Dr. Clyde ignored a large, red lump on his back. Plaintiff explained in deposition:

> Plaintiff: [N]ow her [Dr. Clyde] and Mr. Amaru . . . they would sit there, and when I come in to see them they would sit there and touch my back and watch this thing grow day by day every time I have to hobble down there.
>   All they do is touch it, touch my back, this big growth that's starting to growing up here. It started from day – within the time October 2 or 3 till the 20 – 26th when I got into the hospital, from not being able to see it grow to seeing a great big growth like this, like a big S shape in my back in my spine where people can visually see this.
>
> Counsel: So it changed over time?
>
> Plaintiff: Oh, yes. You could see it. It stuck out. It was a big major infection, red, bright red, beet red. And her being a doctor should be trained to know something – something is wrong, you know. And he was right there with Dr. Clyde at the same time.

*Plaintiff's Deposition*, at pp. 94-95 (as transcribed).

MEMORANDUM ORDER- 10

He goes on to state:

> Plaintiff: And a doctor, being a paid professional doctor, should have known that there could be more possibilities during this time, 20 some days and seeing this growing, this thing growing out of a guy's back.
> That's what really upsets me, is she could visually see what was wrong with me. That's what I got witnesses stating that they could see it. That would be from John Garcia, Lalo Hernandez, and all of them, all of the ones that I have in my amended complaint attached.

*Plaintiff's Deposition*, at p. 96.

Plaintiff has provided affidavits from several witnesses to support his contention that his severe back condition was ignored. Witness John Garcia states:

> I saw Terry Anderson walking really sideways, I had asked him what was wrong and he said it was his back, that he had just came from the doctor. I asked him if he needed any help because he was not looking good. The next day I saw him he couldn't even use his feet[;] he had told me that he could not feel them (his feet), I told him to be careful because it looked like he was gonna trip over himself, also there was numerous times that I had asked Terry Anderson if the doctor was helping him and he had said not really. I remember as the days continued his back was getting worse, but still he could get no help from none of the staff, 'cause they all told him they call the C.M.S. but I never seen them come to the unit.
>
> As the days continued to go by I could notice that the pain he had was getting worse, he told me a couple days later, that the doctor told him to stop faking it and it didn't take a rocket scientist to see he was not faking it!
>
> I looked at his lower back and I seen it, that it was swollen and real, but they though he was faking it, a thing that I could not understand is why didn't the staff give him something to assist him to get around like a wheelchair or something, because he could do nothing for himself. Yet all of us could see the redness and swelling in his back.

MEMORANDUM ORDER- 11

> I want to tell the Court about this[;] it was wrong to let a human being suffer like that.

*Affidavit of John Garcia*, at p. 2 (Docket No. 39) (as written).

Witness Patrick Henry states:

> I could tell just by the way he carried himself, that he was hurt bad! He also told me that he was losing his feelings in his toes. I also noticed Terry flicking his foot forward as he took a step so it wouldn't drag on the ground and trip him.
> \* \* \*
> I also saw Terry's back[;] he would show me it was red in the lower back and looked to be swollen in an -S- shape that could be seen with the eye."

*Affidavit of Patrick Henry*, at p. 3 (Docket No. 39) (as written).

Plaintiff also asserts that Dr. Clyde denied him physical therapy, even though Dr. Montalbono had recommended it. *Amended Complaint,* at p. 7 (Docket No. 31). The medical records show that physical therapy was considered several times during the course of his recovery. On November 20, 2000, Dr. Clyde authorized Plaintiff a follow-up visit with Dr. Montalbono, for the purpose of a post-operative visit, with instructions to evaluate Plaintiff to determine if "ongoing therapy" was required. *Plaintiff's Medical Records attached to Clyde Affidavit* (Docket No. 117, Attachment 6, Exhibit C, at p. 34). On November 27, 2000, Physician Assistant Barrett noted in Plaintiff's medical records an intent to set a physical therapy consultation. *Plaintiff's Medical Records attached to Clyde Affidavit* (Docket No. 117, Attachment 6, Exhibit A, at p. 17). No consultation was ever scheduled.

There is some indication in the medical records that physical therapy may have been appropriate. Plaintiff's medical record for November 12, 2000, notes: "the patient is

wondering if and when the numbness in his left foot/toes will go away and if he will ever be able to dorsiflex his right foot again." *Plaintiff's Medical Records attached to Clyde Affidavit* (Docket No. 117, Attachment 6, Exhibit A, at p. 20).

Defendants argue that because no physical therapy was ever ordered for Plaintiff's condition, there can be no deliberate indifference in failing to provide it. The Court sees the issue more broadly – whether the failure *to order* physical therapy, as well as the failure *to provide* it, given the many references in the record to it, was deliberate indifference. Because the allegation of failure to provide physical therapy is part of Plaintiff's claim that Defendants were deliberately indifferent to his back condition, the Court will allow Plaintiff to proceed to trial on it.

    3.    <u>Defendant Snarr</u>

Plaintiff asserts three issues with Defendant Mary Snarr: first, that she was deliberately indifferent for failing to order Dr. Clyde to undertake a different course of treatment; second, that Snarr failed to order that Plaintiff be taken to the hospital sooner; and third, that Plaintiff was dissatisfied with her response to his Grievance. Snarr has brought forward evidence showing that she did not participate in, direct, or control the medical evaluation, diagnosis, or treatment of Plaintiff. *Affidavit of Mary Snarr*, at ¶ 4 (Docket No. 17, Attachment 16); *Affidavit of Dr. Robert Hill*, at ¶ 17 (Docket No. 17, Attachment 11). Snarr has no medical training to perform such tasks. *Snarr Affidavit*, at ¶ 3. Snarr's job duties are to ensure administrative coordination of off-site medical treatment for prisoners, following orders of a physician. *Snarr Affidavit*, at ¶ 5. Plaintiff has provided no facts rebutting Snarr's nonparticipation in his treatment and her limited

MEMORANDUM ORDER- 13

role in coordinating off-site treatment.  Accordingly, there is no genuine issue of material fact, and summary judgment is appropriate on the first two issues.

As to the third issue – that Plaintiff disagrees with Snarr's response to his Grievance – he has failed to state a claim upon which relief can be granted.  The Grievance answer, which was drafted on December 22, 2000, has no causal relationship to his earlier back treatment in October and November of 2000.  Accordingly, Snarr is also entitled to summary judgment on the third issue.

    4.    <u>Defendant Monica Ford</u>

When Plaintiff filed his Grievance, Monica Ford, an administrative assistant to Warden Dave Paskett, wrote a response to the grievance.  Her response was as follows, in pertinent part: "A missed diagnosis can happen with any medical condition, for anyone.  The fact that CMS continued to search fora reason and act upon the finding, in my opinion does not support negligence."  *Affidavit of Monica Ford*, ¶ 4 and Exhibit, p. 4 (Docket No. 111, Attachment 4).

Ford's response occurred well after the incident in question.  Plaintiff acknowledged in deposition that Ford had nothing else to do with Plaintiff's medical care.  *Deposition of Terry Anderson*, at pp. 51-52 (Docket No. 122).  Because there is no causal connection between Ford's response and Plaintiff's injuries, Ford is entitled to summary judgment.

### IV.
### PLAINTIFF'S MOTION TO STRIKE

Plaintiff has filed a Motion to Strike (Docket No. 130). Plaintiff asks the Court to strike the Affidavit of Gloria Counsil. He asserts that she has a conflict of interest because she is a defendant in another action he has filed against IDOC officials. Ms. Counsil cannot control who sues her, and Plaintiff cannot control Defendants' choice of witnesses. Plaintiff has failed to show any proper legal basis for striking Counsil's Affidavit. The Motion shall be denied.

## V.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

A. The Motion for Summary Judgment filed by Defendant Monica Ford (Docket No. 111) is GRANTED.

B. The Motion for Summary Judgment filed by Defendants Clyde, Cooper, and Snarr (Docket No. 117) is GRANTED in part as to Plaintiff's claims of denial of Flagyl and failure to change post-op dressing as to Defendant Cooper; it is DENIED in part as to Defendant Cooper regarding Cooper's initial assessment of Plaintiff; it is DENIED as to Defendant Clyde; and it is GRANTED as to Defendant Snarr.

C. Plaintiff's Motion to Strike (Docket No. 130) is DENIED.

D. Defendants' Motion for Extension of Time (Docket No. 134) is GRANTED. The Court has considered Defendants' Replies and Responses.

E.  The parties shall be required to participate in a judicial settlement conference prior to proceeding to trial. United States District Judge David Ezra, from the District of Hawaii, will be available to conduct settlement conferences in Boise on December 12 and 13, 2005. The parties shall contact Denise Asper, Esq., the Court's ADR Director, at 334-9067, to schedule a settlement conference with Judge Ezra during that block of time.

DATED: **September 28, 2005**

B. LYNN WINMILL
Chief Judge
United States District Court